[No. 41536-1-I.    Division One.    April 12, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. IRA J. WOOLFOLK, *Appellant*.

*Stella S. Buder* of *Washington Appellate Project*; and *Kira McCrae* of *Snohomish County Public Defender Association*, for appellant.

*James H. Krider, Prosecuting Attorney*, and *Seth Aaron Fine, Deputy*, for respondent.

WEBSTER, J. — Although charged with possession of a controlled substance with intent to manufacture or deliver while armed with a firearm, Appellant Ira Juan Woolfolk was convicted only on the lesser-included offense of simple possession. The jury returned a special verdict finding that Woolfolk was armed with a deadly weapon. This appeal presents two questions: (1) whether Woolfolk should be allowed to argue to the jury lack of knowledge of the gun as relevant to the charge of being armed with a deadly weapon where the definition of "armed" does not explicitly include a knowledge component; and (2) whether the trial court may impose a firearm enhancement based on the deadly weapon finding. Because we find that the trial court erred

in precluding Woolfolk's argument, we vacate the firearm enhancement, reverse the deadly weapon finding, and remand for retrial on the question whether Woolfolk was armed with a firearm. Because we remand on this issue, we need not address the sentencing question.

## BACKGROUND

Woolfolk was charged by information on October 3, 1996, for possession of a controlled substance with intent to manufacture or deliver while armed with a firearm. Woolfolk was convicted by a jury of the lesser-included offense of simple possession of a controlled substance. The jury returned a special verdict finding that Woolfolk was armed with a deadly weapon. The court imposed a standard range sentence of 6 months for the possession and an 18-month enhancement for being armed with a firearm.

Testimony at trial revealed that on October 12, 1995, Everett Police Detective Cheryl Lynn Braley initially contacted Woolfolk by calling a pager she thought belonged to him and leaving a message containing her cellular telephone number followed by two codes used in the drug trade: "100" to indicate she wanted to make a $100 purchase, and "911" to indicate that she wanted to be called back immediately. When a woman returned Braley's page, Braley asked for Woolfolk. With Woolfolk on the line, Braley attempted to set up a meeting to purchase $100 of cocaine. The eventual meeting place, a fast-food restaurant, was established during a second telephone conversation between Braley and Woolfolk. Woolfolk wanted to send a female to the meeting place to "serve" Braley, but she insisted on meeting only with Woolfolk. Braley testified that Woolfolk indicated that he "might" be the one to "serve" Braley and described him as "noncommittal."

Regarding the telephone conversations, Woolfolk testified that, based on Braley's description of herself, he was very interested in knowing her. He claimed that he never told Braley that he would personally deliver anything to her. He testified that in response to Braley's insistence that she deal only with him, he responded, "I'll try, I don't think

it's going to happen that way." Woolfolk said, ". . . I was trying to set it up. Trying to get it set up where she could get what she wanted . . . I didn't have what she wanted." He planned to tell Braley when he met her that there was nothing he could do for her and ask her to go to Lake Stevens and then on to a cabin in Wenatchee with him and his companions for a day or two.

While waiting outside at the designated meeting place, Braley observed a brown car drive by, through the parking lot of the restaurant, and up the street, where it stopped. Woolfolk was in the back seat. He walked back to meet Braley and said, "Let's walk." Before they went far or had any conversation, the car drove past again, and the female driver yelled to Woolfolk to get into the car because it was a setup. Woolfolk complied and the car took off. Police officers providing backup to Braley stopped the car and arrested the occupants—Woolfolk in the back seat, Darcy Crenna, the driver, and another female, also in the front seat.

A search of Woolfolk produced cocaine. A pile of clothing and several women's handbags were found in the backseat of the car. A search produced a black pager and a .25 caliber semiautomatic gun inside the sleeve of a man's green jacket. Braley testified that she determined from a test and from examining the pager's memory that it was the one she had earlier called to contact Woolfolk.

Woolfolk disclaimed any knowledge of the gun. The gun was not fingerprinted. Woolfolk testified that the pager belonged to Crenna and that she had it in her possession the last time he saw it. He testified that his belongings were in the trunk and the clothing and other things found in the backseat did not belong to him. No identification was found in the green jacket. Woolfolk was wearing a different coat when arrested.

The State made a motion in limine to prohibit Woolfolk from arguing that knowledge is an essential element of being armed with a deadly weapon. Woolfolk's counsel argued before the court that knowledge is logically included in the definition of armed:

[T]he definition of . . . armed . . . is easily accessible and readily available for use either for offensive or defensive purposes. "Easily accessible" would lead one to believe that you need to know it is there in order to access it. "Readily available for use" would incorporate that someone would need to know it is there for their use for offensive or defensive use. It's necessarily included.

The court disagreed:

"Armed with a deadly weapon" has been clearly defined in many cases in the state, which means that a weapon is readily available for use, either offensive or defensive. None of the cases talk about the knowledge or anything else as being an element of that. The gun is either available to be used or it isn't available to be used, based upon the facts of the case. It's accessible or it isn't. And the jury will make a determination as to whether or not they feel the gun was in fact in that location and available for use in that manner.

The law doesn't seem to discuss notice or knowledge at all. And therefore, the Court hasn't given any instructions on it; since there is no instruction on it, it would be improper to argue.

The court also noted that an accomplice may be convicted of being armed with a deadly weapon where the principal was armed, even if the accomplice had no knowledge of a weapon. Defense counsel was allowed to argue that the gun was not easily accessible or readily available.

Instruction No. 13 informed the jury that "[a] person is armed if a weapon is easily accessible and readily available for use, either for offensive or defensive purposes." Instruction No. 14 was a general accomplice instruction:

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of a crime, he or she either: (1) solicits, commands, encourages, or requests another person to commit the crime; or (2) aids or agrees to aid another person in planning or committing a crime.

The word "aid" means all assistance whether given by words,

acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

Instruction No. 15, tracking the language of RCW 9.94A.125, provided the definition of a deadly weapon:

> For purposes of a special verdict the State must prove beyond a reasonable doubt that the defendant was armed with a deadly weapon at the time of the commission of the crime.

> A deadly weapon is an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death. The following instruments are examples of deadly weapons: blackjack, sling shot, billy club, sandbag, metal knuckles, any dirk, dagger, pistol, revolver or any other firearm, any knife having a blade longer than three inches, any razor with an unguarded blade, and any metal pipe or bar used or intended to be used as a club, any explosive, and any weapon containing poisonous or injurious gas.

During deliberations, the jury made the following two inquiries of the court: (1) "We would like clarification to instruction #13. Does one have to have knowledge of accessibility of a weapon in order for it to be considered accessible?"; and (2) "Can the knowledge of the accomplices be used in implicating Ira Woolfolk's knowledge of the gun?" Clerk's Papers (CP) at 27-28. The court responded, "The court cannot supply any further information beyond the instructions already provided." CP at 27-28.

## ANALYSIS

### A. Woolfolk Should Not Be Precluded from Arguing Lack of Knowledge as Relevant to the Charge of Being Armed with a Deadly Weapon

"A person is 'armed' if a weapon is easily accessible

and readily available for use, either for offensive or defensive purposes." *State v. Valdobinos*, 122 Wn.2d 270, 282, 858 P.2d 199 (1993). Woolfolk contends that his constitutional rights to counsel and to a jury trial were violated by the trial court's prohibition on his argument to the jury that his knowledge of the weapon was relevant to whether the gun was available and accessible for use.

The cases discussing when an individual is armed are of limited value here because they have focused on the physical proximity of the weapon. In *Valdobinos*, evidence at trial revealed that the defendant offered, at a tavern, to sell cocaine to an undercover officer. *See* 122 Wn.2d at 273. Two days later, with a warrant, officers searched the defendant's trailer home and discovered cocaine. *See id.* at 273-74. The officers also found an unloaded rifle under the bed in the bedroom. *See id.* at 282. The court found this evidence insufficient to qualify the defendant as "armed" and struck the sentence enhancement. *See id. See also State v. Call*, 75 Wn. App. 866, 869, 880 P.2d 571 (1994) (finding that two guns in a dresser drawer and one in a tool box, all in the defendant's bedroom, which were discovered in a search for drugs, were insufficient to support a conclusion that the defendant was armed); *State v. Mills*, 80 Wn. App. 231, 236, 907 P.2d 316 (1995) (the issue in whether a gun is easily accessible is the nexus between the gun and the defendant, not the nexus between the gun and the drugs). But a defendant was found to be armed where a loaded gun was found under the defendant's seat in an automobile, visible to a person leaning into the car and with the grip easily accessible to the defendant. *See State v. Sabala*, 44 Wn. App. 444, 448, 723 P.2d 5 (1986).

■ To address Woolfolk's challenge we must examine what latitude the right to counsel affords at closing argument. Closing argument is perhaps the most important aspect of advocacy in our adversarial criminal justice system. *See Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975). For the defense, it is "the last clear chance to persuade the trier of fact that

there may be reasonable doubt of the defendant's guilt."
*See id.* But the trial judge has broad discretion to control
and restrict closing arguments:

> The presiding judge must be and is given great latitude in con-
> trolling the duration and limiting the scope of closing summa-
> tions. He· may limit counsel to a reasonable time and may
> terminate argument when continuation would be repetitive or
> redundant. He may ensure that argument does not stray un-
> duly from the mark, or otherwise impede the fair and orderly
> conduct of the trial. In all these respects he must have broad
> discretion.

*Id.*

■ Statements by counsel to the jury on the law must
be confined to the law as set forth in the instructions of the
court. *See State v. Davenport*, 100 Wn.2d 757, 760, 675 P.2d
1213 (1984). But counsel are granted more latitude in their
discussion of the facts of the case:

> It is the duty of the court, in all cases, to restrict the argu-
> ment of counsel to the facts in evidence, and not to permit the
> opposite party to be prejudiced by any statement of facts not a
> part of the evidence. But counsel must be allowed some
> latitude in the discussion of their causes before the jury, and if
> they are not permitted to draw inferences or conclusions from
> the particular facts in evidence it would be impossible for them
> to make an argument at all. The mere recital of facts already
> before the jury is not an argument. There must be some rea-
> son offered for the purpose of convincing the mind, some infer-
> ence drawn from facts established or claimed to exist, in order
> to constitute an argument.

*Sears v. Seattle Consol. St. Ry. Co.*, 6 Wash. 227, 233, 33 P.
389 (1893) (quoted in *City of Seattle v. Arensmeyer*, 6 Wn.
App. 116, 121, 491 P.2d 1305 (1971) (where defense counsel,
during closing argument, reasonably inferred from the evi-
dence that the police officers involved in the case were in-
experienced, the trial court's interruption to say that
defense counsel was mistaken as to the evidence was an
improper and prejudicial comment on the evidence)).

Woolfolk looks to the reasoning found in *United States v. DeLoach*, 504 F.2d 185 (D.C. Cir. 1974). In that case, the defendant's counsel used much of closing argument to demonstrate that none of the testimony of a confessed accessory to the crimes incriminated the defendant. *See id.* at 187-88. The climax of the argument was an attempt to show that the accessory witness may have committed the crimes himself. *See id.* at 188. This attempt was derailed by prosecutorial objections sustained by the trial court. *See id.* The appellate court characterized the trial court's actions as precluding defense counsel from suggesting inferences to the jury that were supported in the evidence and went to the heart of the defendant's theory of the case. *See id.* at 190-91. Finding the trial court to be in error, the *De-Loach* court stated, "A criminal defendant's constitutional rights to counsel and to a jury trial encompass a right to have his theory of the case argued vigorously to the jury." *Id.* at 189. The appellate court recognized the limits of the trial court's discretion in regulating the scope of closing argument:

> The trial court has broad discretion in controlling the scope of closing argument. That discretion is abused, however, if the court prevents defense counsel from making a point essential to the defense.
>
> In regulating the scope of argument, the court should be guided by criteria that are related to the function of argument, i.e., to help the jury remember and interpret the evidence. The prosecutor and the defense counsel in turn must be afforded a full opportunity to advance their competing interpretations . . . . The court should exclude only those statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury.

*Id.* (quoting *United States v. Sawyer*, 443 F.2d 712, 713-14 (D.C. Cir. 1971)).

■ Woolfolk contends that he was erroneously precluded from arguing his only theory of the case: that because he did not know about the gun he was not armed. From Woolfolk's point of view the issue is not whether the gun was

physically within reach but whether he could have used the gun. Essentially, his argument is that a person cannot use an object of which he lacks awareness.

Woolfolk's argument has commonsense appeal. Consider the following hypothetical: a passenger in the front seat of an automobile is illegally in possession of a controlled substance, and the owner and driver of the vehicle has a gun stored in the unlocked glove box. The driver has no knowledge of the controlled substances on her passenger, and the passenger has no knowledge of the driver's gun. Although the gun may be within reach of the passenger, it goes against common sense to say that the passenger is armed. Because the passenger does not know it exists, he cannot *use* the gun. And it is the potential use of guns that is at the heart of the firearm enhancement.

There is evidence in the record from which an inference may be drawn that Woolfolk did not know about the gun: he testified that he was not aware of the gun; there was no identification in the jacket in which the gun was found nor did the State tie the jacket to Woolfolk; Woolfolk was wearing a different coat; the State did not produce fingerprints from the gun; and there was evidence from which the jury could infer that the pager, which was found with the gun, belonged to Crenna.[1] Woolfolk was not prevented from reminding the jury of this evidence but was precluded from driving home the crucial point that if they believed Woolfolk when he said he did not know about the gun, then they should find that he was not armed. Woolfolk should not be precluded from arguing his theory of the case to the jury, and we find that the trial court erred in granting the State's motion in limine.

We wish to stress that although we allow Woolfolk to argue his theory of the case before the jury, we do not make knowledge of the gun an element of the firearm enhancement that must be proven by the State. We hold only that in cases where lack of knowledge of the firearm arises

---

[1]There is, of course, other evidence with which the State may rebut the inference that Woolfolk was unaware of the gun.

under the facts, the defendant must be permitted to argue before the jury his theory that he was not armed under the definition because he was unaware of the firearm.

### B. The Error Was Not Harmless

■ "[C]onstitutional error requires reversal unless the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in absence of the error." *State v. Russell*, 125 Wn.2d 24, 94, 882 P.2d 747 (1994). The jury's inquiry, "Does one have to have knowledge of accessibility of a weapon in order for it to be considered accessible?" indicates that the jury apparently struggled over the question whether Woolfolk was aware of the gun. Had Woolfolk's counsel had the opportunity to argue that Woolfolk was not aware of the gun, a reasonable jury might have reached a different result. Therefore, the error was not harmless.

The State's argument that the jury would have convicted Woolfolk of being armed with a deadly weapon on an accomplice theory, despite any lack of knowledge of the gun, fails because the deadly weapon instruction did not inform the jury of this possibility. Although a general accomplice instruction was given, the deadly weapon instruction provided that the State must prove beyond a reasonable doubt that *the defendant* was armed with a deadly weapon, not a defendant *or an accomplice*.

### C. On Remand, the Only Question for Retrial Is Whether Woolfolk Was Armed with a Firearm

■ On remand, Woolfolk may not be retried on the offense of possession of a controlled substance with intent to deliver, as the State requests. Conviction of a lesser-included offense acts as an implied acquittal of the greater offense and double jeopardy bars retrial on the greater crime. *See Green v. United States*, 355 U.S. 184, 190-91, 78 S. Ct. 221, 2 L. Ed. 2d 199, 61 A.L.R.2d 1119 (1957) (the jury convicted on a lesser charge and was dismissed without returning an express verdict on the greater crime); *see also State v. Brown*, 127 Wn.2d 749, 756-57, 903 P.2d 459 (1995)

("[d]ue to double jeopardy concerns, the defendant cannot be retried on charges greater than the charge for which he was convicted"). The State points us to *State v. Carson*, 128 Wn.2d 805, 821, 912 P.2d 1016 (1996), but that case does not control here because Carson's first trial ended in a mistrial when the jury was unable to reach a verdict.

## CONCLUSION

We vacate the firearm enhancement, reverse the deadly weapon finding, and remand for retrial on the question whether Woolfolk was armed with a firearm.

BECKER and APPELWICK, JJ., concur.